FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROBERT COOPER, # 209556       *
Plaintiff,       *
     *
v       *       Civil Action No.  JFM-13-3692
     *
BRAD BRINEGAR,       *
C or F DAVIS,       *
B. PAYTON,       *
CPL LOGGSON,[1]       *
CPL WILBURN,       *
CPL BARB,       *
CPL HENDRICKS,       *
CHIEF MICHAEL P. THOMAS,       *
CPL. S.A. WILSON,       *
CPL. R. CONNER,       *
CPL. J. FONTAIN,       *
CPL. HETZ,       *
CPL. M. DAVIS,       *
OFFICER HENDRICKS,[2]       *
S. DILLEY,[3]       *
RONALD SHANE WEBER,       *
FRANK BISHOP       *
SGT. CRUMPAC,[4]       *
GREGG HERSHBERGER, SECRETARY,       *
     Defendants.       ******

## MEMORANDUM

Pending is self-represented plaintiff Robert Cooper's ("Cooper") complaint filed pursuant

to 42 U.S.C. § 1983, as supplemented. (ECF 1, 6).[5]  Defendants, former Warden Frank B.

---

[1] The Clerk shall amend the docket to reflect defendant's surname is spelled "Logsdon."

[2] Officer Hendrick and Cpl. Hendrick appear to be the same individual. No claims are raised against a defendant named Hendrick. Service was accepted by counsel on behalf of David L. Hedrick, C.O. II. (ECF 10).

[3] Service has not been obtained on Officer S. Dilley, who is on extended military leave. (ECF 27-1, n. 3).

[4] This case was consolidated with Civil Action No. JFM-14-629, as the cases are premised on claims arising from the same incident and involve substantially the same defendants. Sgt. Crumpac and Gregg Hershberger were added as defendants consistent with the order of consolidation. Apart from including Crumpac and Hershberger as defendants, however, Cooper makes no specific claims either individual. In fact, neither is mentioned in the body of the complaint. *See* JFM- 14-629, ECF 1. Accordingly, Sgt. Crumpac and Gregg Hershberger will be dismissed.

Bishop, Jr.[6] Chief of Security Michael P. Thomas, Sgt. Brett E. Payton, C.O. II Brad M. Brinegar, C.O. II Clinton T. Davis, C.O. II William L. Logsdon, C.O. II Brett A. Wilburn, C.O. II Charles L. Barb, II, C.O. II David L. Hedrick, C.O. II Steven A. Wilson, C.O. II Jeremiah L. Fontaine, C.O. II Nicholas A. Hetz, C.O. II Matthew J. Davis, C.O. II Ronald L. Connor, and Mental Health Professional Counselor (MHPC) Supervisor Ronald S. Weber, by their counsel, have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF 27). Cooper was provided an opportunity to file an opposition reply with materials in support in accordance with the ruling *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975), and has done so. (ECF 31).[7]

After considering the pleadings, exhibits, and applicable law, the court finds a hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For reasons to follow, defendants' motion (ECF 27), treated as a motion for summary judgment, will be DENIED in part and GRANTED in part.

## BACKGROUND

Cooper is an inmate in custody of the Maryland Division of Correction and is housed at Western Correctional Institution ("WCI") in Cumberland, Maryland. Cooper alleges that on October 22, 2013, he was subjected to excessive use of force, including the administration of pepper spray, and placed in a "strip cell" for three days afterward without bedding, clothing, hygiene items, and medication. (ECF 1, ECF 6  p. 9). He also alleges he was denied food and

---

[5] As indicated above, Cooper filed repetitive claims based on this incident in several cases. On January 29, 2014, the court dismissed *Cooper v. Brinegar, et al.*, Civil Action No. JFM-13-3873 without prejudice and ordered the complaint in that case be entered as a supplement to this case, as he presented substantially the same claims against the same defendants in both cases. (ECF 6, 7). The supplement (ECF 6) was submitted by Cooper as a declaration.

[6] Bishop was warden at Western Correctional Institution at the time of the use of force incident at issue.  Richard J. Graham, Jr. is presently warden at that facility.  *See* http://www.dpscs.state.md.us/locations/wci.shtml.

[7] Cooper's opposition consists of a general and summary denial of defendants' response. Cooper has not submitted any exhibits or declarations in support. (ECF 31).

medical care during the 8-4 shift on these days. Cooper claims he was coerced into signing "false" Matter of Record containing a "confession" that he assaulted Officer Brad Brinegar ("Brinegar"). Cooper was found guilty of assaulting Brinegar at an institutional adjustment hearing and sanctioned with 200 days of segregation status, revocation of 120 days of good conduct credit, and loss of visiting privileges. (ECF 27-16). He later received an additional 30 days of cell restriction from the Reduction in Violence Committee. *Id.* Cooper appealed the decision to the Inmate Grievance Office. A hearing was held on April 30, 2014 before Administrative Law Judge Eileen Sweeney who found the sanctions proper and based on substantial evidence. (ECF 27-25).

Additionally, Cooper maintains that he was subjected to a retaliatory "shakedown" on December 3, 2013, at which time legal materials and his Administrative Remedy Procedure (ARP) logbook were taken and not returned, and personal property, including clothing and medical stockings, were damaged. He alleges Brinegar confiscated a copy of one of his lawsuits during this shakedown. Plaintiff states that he filed an ARP, but it was dismissed because the matter was referred to the Internal Investigative Unit (IIU). (ECF 1, 6). For relief, Cooper requests nominal, compensatory, and punitive damages, and injunctive relief including replacement of his property and a transfer to a "safer" Maryland prison. (ECF 6, pp. 13-14).

## LEGAL STANDARD

Defendants' dispositive motion will be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 against because materials outside the original pleadings have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Rule 56 of the Federal Rules of Civil Procedure states a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557 (2009); *Scott,* 550 U.S. at 378.  The court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249–50.  A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express* Corp., 190 F.3d 624, 633 (4th Cir. 1999).

Recognizing that Cooper is a self-represented litigant, the complaint will be held to a less stringent standard than that drafted by an attorney. *See Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978) (discussing liberal construction of pro se pleadings).  Federal courts are charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The requirement of liberal construction does not mean, however, that the court can ignore a clear failure in the

pleading to allege facts which set forth a claim currently cognizable in a federal district court. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 390–91 (4th Cir. 1990).

## DISCUSSION

### I.  Defendants' Response

Defendants have filed verified exhibits and declarations in support of their Motion for Summary Judgment. None is challenged or otherwise controverted by Cooper in his opposition. Defendants' exhibits are summarized below.

### A. Internal Investigation Unit Report

An Internal Investigation Unit ("IIU") investigation was initiated upon request of Captain Brad Butler after Cooper filed correspondence complaining about the incident. (ECF 27-4, p. 44).[8] Detective Scott Peterson was assigned by the IIU to investigate.

Peterson states in the IIU report that on December 13, 2013, he received a letter from Cooper, alleging that six unknown officers assaulted him on October 22, 2013. Cooper later identified the officers to Peterson as Brinegar, Davis, Wilburn, Barb, Logsdon, and Hendricks. *Id.* p. 19.

On December 18, 2013, Peterson requested the security camera recording from October 22, 2013, for housing unit 4 where the incident took place. He was informed by Captain Butler

---

[8]  Butler's report to the IIU reads:

> Called to report that Inmate Robert Cooper, #209556 was walking in the lobby and kicked C.O. II Bradley Brinegar as a result in this incident he was taken to the floor and pepper sprayed. At the time Inmate Cooper did not comply with any direct orders to stop therefore CO II Brinegar called for backup. CO II's Matthew Davis, David Hedrick, William Logsdon, and Chuck Barb arrived on the scene to assist CO II Brinegar. As a result of this Inmate Cooper is alleging unnecessary use of force. Inmate Cooper sustained a black eye and injured ribs, and wishes to pursue criminal charges.

(ECF 27-4 p. 5). As defendants' note, Cooper's medical record after the incident does not indicate he sustained a black eye or injured ribs. (ECF 27-1, n. 4; ECF 27-4, pp. 2-4). Defendants maintain it is not clear whether these injuries were reported as having been observed by staff or reported by Cooper. (ECF 27-1, n. 4). The photographs of Cooper taken after the incident do not show he had a black eye. (ECF 27-4, pp. 89-90, 96-97).

that the incident was not captured due to the lack of cameras in the lobby of the housing unit. *Id.* at 20, 66. [9]

### 1. Cooper Interview

Peterson interviewed Cooper at WCI on December 18, 2013. (ECF 27-4, pp. 21-23). Cooper states that on October 22, 2013, he was sitting on the toilet in his cell when Brinegar walked past. Brinegar stated to another officer "Oh he's not ready. He doesn't get any rec." *Id.* at 21. Cooper stood, pulled up his jumpsuit, went to the cell door, and yelled for Brinegar. Cooper asked why he was not getting recreation. Cooper was told he was not ready because he did not have his jumpsuit over his shoulders. Cooper asked how he could be ready or have the jumpsuit over his shoulder when he was on the toilet. Brinegar responded "Too bad. Fuck you." *Id.* Cooper replied, "No problem, suck my dick." *Id.* Brinegar left to escort other inmates outside for their recreation.

Brinegar returned and asked Cooper if he wanted recreation. Cooper replied he did. Cooper, handcuffed from behind, exited his cell. Brinegar then asked whether Cooper still wanted him to "suck his dick." *Id.* Cooper answered all he wanted was his recreation time. *Id.*

Cooper and Brinegar entered the lobby and turned left. Cooper alleges that "[a]t that point in time, in that area there's no security video he slams me face down on the concrete floor in the lobby. There was an officer standing there waiting on us by the name of Davis." *Id.* Brinegar asked Cooper again if he still wanted him "to suck his dick." *Id.* at 22. Cooper replied, "Look man, I'm done. You win. I don't want any problems." *Id.* Brinegar then punched Cooper in the face and pepper sprayed him. Cooper states Hearing Officer David Sipes arrived to see

---

[9] Defendants have filed a declaration executed by WCI Chief of Security Michael Thomas which states "[s]ecurity cameras at the institution are used to assist custody staff in their daily duties. The surveillance system is not meant to be used as a means of security in and of itself." (ECF 27-6).

what was happening. Cooper claims Sergeant Payton was in the control center and began to alert
Brinegar that Officers Davis and Sipes were coming down the hallway.

Cooper said he was ordered to get up but was unable. Brinegar then picked him up and
escorted him to the property room "strip cage" where Brinegar and Davis kicked, punched, and
sprayed him with pepper spray. *Id.* Cooper said there were no security cameras in the property
room. *Id.* Cooper alleged he was assaulted by all six officers. *Id.* Cooper stated his eye was
swollen shut and he had rib injuries and swelling to his head. *Id.* Cooper stated he was treated
by Nurse Dennis Martin for pepper spray exposure, and his physical injuries went unaddressed.
*Id.*

Cooper said Logsdon made him sign a statement that he was sorry. Cooper was told if he
did not sign the statement, the assault would continue. *Id.* Cooper denied kicking Brinegar. *Id.*
He alleged Brinegar accused him of assault to "cover up" what really happened. *Id.*

### 2. Interviews with Correctional Officers [10]

On January 27, 2014, Peterson interviewed Lieutenant William F. Gordon, Jr., who is the
manager of Housing Unit # 4. Gordon confirmed observing Cooper being escorted on October
22, 2013 from his cell to the outside recreation area. *Id.* at 24. Gordon observed Cooper
struggling with Brinegar and attempting to kick him. *Id.* Cooper continued to resist after
Brinegar took him to the floor. *Id.* Gordon said four staff members, one of whom he identified
as David Sipes, arrived to restrain Cooper. *Id.* at 24. Gordon denied seeing any staff strike
Cooper. Gordon stated after pepper spray was administered, Cooper was brought to his feet,
taken for medical evaluation, and placed in a contingency cell. *Id.* at 25. Gordon stated per
institutional protocol, he contacted Cooper the day after the incident. At that time, Cooper did
not allege he had been assaulted or subjected to excessive force. *Id.*

---

[10] Detective Peterson was unable to interview Officer Dilley, who was on extended military leave.

On February 4, 2014, Peterson interviewed Officer Brinegar, who provided the following account. On October 22, 2013, Brinegar was escorting Cooper from his cell to recreation. Upon arriving at the lobby in Housing Unit # 4, Cooper kicked him and began to pull away. Brinegar ordered him several times to stop, and took him to the floor Brinegar told Cooper that if he did not stop resisting, pepper spray would be administered. Cooper continued resisting and attempted to stand. At this point, Brinegar administered pepper spray. *Id.* at 25-26. Cooper was brought to his feet and taken to the medical room.

Peterson asked how the list of inmates who want to participate in recreation is compiled. Brinegar said each inmate is required to be standing at his door during "Formal Stand Up Count." At that time, the inmate must inform the officer if he wants recreation. *Id.* at 26-27. Brinegar denied compiling the count list on October 22, 2013, and denied telling Cooper to "suck his dick." *Id.* at 27. [11] Brinegar denied having any conversation with Cooper prior to the escort.

Brinegar indicated he was the only officer who escorted Cooper from his cell to the lobby on October 22, 2013. Brinegar did not know whether there were any other officers in the lobby when he and Cooper arrived. He indicated he was also affected by the pepper spray. Brinegar stated he believed Officer Dilley arrived and escorted Cooper to the medical room. *Id.*

Brinegar denied striking Cooper at any time during this incident or witnessing other staff assaulting him. He stated he sustained a red mark on his right leg after Cooper kicked him. [12]

---

[11] The complaint states that it was Cooper who told Brinegar to "suck his dick."

[12] The red mark on Brinegar's leg is not apparent in the photograph submitted for the record. (ECF 30-4, p. 91).

8

Brinegar said he thought Dilley escorted Cooper to the medical room, but was uncertain whether Dilley was assisted by other officers. [13]

On February 4, 2014, Peterson interviewed Officer Brett Wilburn, who stated he was in the restroom when the incident occurred and denied observing Brinegar escorting Cooper from his cell to the lobby or participating with the escort. *Id.* at 24, 28. Wilburn stated he did not know who had escorted Cooper to the medical room because he was in the control center. *Id.* at 28.

On February 10, 2014, Peterson interviewed Officer Sipes, who stated that on October 22, 2013, he heard a commotion while exiting the adjustment room. He arrived in the lobby and observed Cooper pulling away from the escorting officer. *Id.* at 29. Sipes said Cooper was taken to the floor and pepper spray was administered. Sipes added Cooper struggled with staff until he stated "I give up." *Id.* at 29. Sipes said Cooper was not kicked or punched. *Id.* Sipes said he

---

[13] The Use of Force Report signed by Office Dilleyon October 22, 2013, and provided to the IIU investigator reads:

> On October 22, 2013, at approximately 0830 hours, Officer B. Brinegar, COII was escorting inmate Robert Cooper 209556 from his cell at 4A11B to the outside recreation area at the back of C Wing. During this escort as they walked past the front door in the lobby area, inmate Cooper became resistant to Officer Brinegar's escort and tried to pull away from him. At this time Officer Brinegar asked inmate Cooper what he was trying to do and placed both hands on inmate Cooper's arm in an attempt to retain control of him. Inmate Cooper kicked Officer Brinegar on the right leg and continued to try to pull away from him. Officer Brinegar placed inmate Cooper on the floor of the lobby and gave him a direct order to stop resisting. Inmate Cooper did not comply with his order and continued to kick and get away from Officer Brinegar. At this time Officer Brinegar drew his pepper spray and pointed it at Cooper's head and told him to stop resisting or he would be forced to use pepper spray. Inmate Cooper did not comply with his orders and continued to attempt to fight Officer Brinegar. Officer Brinegar applied a short burst of pepper spray to the facial area of inmate Cooper and he immediately stopped thrashing around and stated, "I'm done, I'm done." Officer Dilley CO II arrived on the scene and assisted Officer Brinegar in bringing inmate Cooper to his feet. Inmate Cooper was escorted to Housing Unit # 4 strip cage by Officer Dilley where he awaited medical attention without further incident. Inmate Cooper was escorted the Housing Unit #4 medical room where he was treated for pepper spray exposure by Dennis Martin, R.N. and escorted to the B Wing shower to remove the pepper spray from his body. After inmate Cooper received his shower he was placed in cell 4B2 and placed on staff alert status.

(ECF 27-4).

observed staff bringing Cooper to his feet and escorting him from the area. Sipes indicated there were only two officers involved in the incident and he was unable to identify them. *Id.*

On February 10, 2014, Peterson interviewed Officer Logsdon, who stated that as he and Sipes were leaving the Adjustment Room, they heard a commotion *Id.* at 27, 30. Upon arriving at the lobby in HU # 4, Logsdon observed Cooper lying on the floor and detected the odor of pepper spray. Logsdon stated Brinegar and Dilley assisted Cooper to his feet and proceeded with him toward the medical room. *Id.* at 30. Logsdon said Brinegar and Dilley were the only officers involved in the incident, and neither Brinegar nor Dilley punched or kicked Cooper. Logsdon confirmed he obtained Cooper's statement of apology after he was examined by medical personnel. Cooper was in the strip cage when he wrote the statement.[14] Logsdon denied that he or any other officer threatened Cooper or told him what to write in his statement. *Id.*

On February 12, 2014, Peterson interviewed Officer Davis. *Id.* at 31. Davis denied working on the 8:00 am to 4:00 p.m. shift on October 22, 2013, and stated he was unfamiliar with the incident involving Cooper. *Id.* On February 19, 2014, Peterson interviewed Officer Barb, who stated he was not working on October 22, 2013. *Id.* at 32. Peterson confirmed the information provided by Davis and Barb by reviewing the WCI assignment worksheets for October 22, 2013. *Id.* at 32.

### 3. IIU Report Findings

The IIU investigation found that contrary to Cooper's assertions, Officers. Davis and Barb were not involved in the incident. (ECF 27-4, p. 36). The report also noted that color photographs of Cooper taken after the incident did not depict any obvious visible injuries to

---

[14]   Cooper wrote in the statement, "I am sorry for what I did." (ECF 27-4, p. 126).

support his claims of physical assault.[15] The investigation concluded Cooper's allegation of use of force could not be sustained and the matter was closed. *Id.*

## B. Medical Records and Photographs

Cooper was seen by Nurse Dennis Martin on October 22, 2013 for pepper spray exposure. The record shows Cooper complained of burning eyes. Martin noted a minor abrasion with no bleeding on top of his head. *Id.* at 84. No swelling was noted or reported and Cooper was able to bear full weight on his extremities. The record states no other injuries were reported. *Id.* In the photographs taken of Cooper, his eyes are clearly swollen. *Id.* at 88.

The following day, Cooper was seen for a complaints of redness and drainage in his left eye. The medical record reports his general eye condition was normal, he was told to use warm compresses, and eye drops were ordered. (ECF 27-5, pp. 4-5).

On October 24, 2013, Cooper was seen for complaints of blurred vision, eye pain, and right lower rib pain. antibiotic drops prescribed for him blurred his vision. An x-ray was ordered which subsequently returned normal results. *Id.* at 7. Cooper was given Motrin. *Id.* He was instructed to reduce the amount of eye drops from three to one drop per day. *Id.* at 10. On October 29, 2013, he was seen by Peggy Mahler, a nurse practitioner, for a follow-up for chest discomfort. An EKG was ordered. *Id.* at 11-12. On January 21, 2014, a medical referral was made to optometry for Cooper's complaints of blurred vision. *Id.* at 21.

## C. Declarations

### 1. Brad Brinegar

Officer Brad Brineger attests that on October 22, 2013 at approximately 8:30 am, he was escorting Cooper from his cell to the outside recreation area. As they walked through the lobby,

---

[15]   The report indicates the photographs were taken on October 25, 2013. The photographs included in the report provided to the court, however, indicate they were taken on October 22, 2013, the date of the incident. The time the photographs were taken is shown as 8:40 a.m., shortly after the use of force incident. (ECF 27-4, pp. 89-90, 96-101).

Cooper became resistant to the escort, tried to pull away and kicked Brinegar in the leg. Cooper was placed on the ground. He continued to thrash and attempt to kick Brinegar. Cooper ignored Brinegar's verbal commands to stop resisting. Brinegar and Officer Dilley escorted Cooper to the Housing Unit 4 strip cage. (ECF 27-3).

Brinegar states Cooper wrote and signed a statement which stated "I am sorry for what I did." Brinegar attests that he neither forced Cooper to sign the statement and nor was present when the statement was written. *Id.*

Brinegar states that on December 3, 2013, he and Officer Logsdon searched cell 4-A-11. The cell, chosen at random for search, was occupied by Cooper and another inmate. No contraband was discovered, nor were items confiscated from either inmate. *Id.*

Brinegar attests that at no time has he "racially discriminated, harassed, or stolen property from Mr. Cooper." (ECF 27-3, ¶ 7). Brinegar attests that "at no time have I assaulted [Cooper] or witnessed any other staff person assault him." *Id.*

### 2. Brett Payton

Sergeant Brett Payton denies involvement in the use of force incident on October 22, 2013. (ECF 7). Payton recommended placing Cooper on staff alert after the incident, and the recommendation was approved by Chief of Security Michael Thomas. Payton attests that Cooper was given his allowable property and personnel hygiene products, including toilet paper, while on staff alert status. *Id.* Payton states at no time has he "racially discriminated against Mr. Cooper or any other inmate. *Id.* ¶ 5.[16] Payton states at no time has he "assaulted [Cooper] or witnessed any other staff person assault him." *Id.*

---

[16] Cooper does not raise any specific claims of discrimination in his complaint. However, Cooper alleges Brinegar called him "a niggar" on November 3, 2013. (ECF 6, ¶ 16).

### 3. William Logsdon

Officer Logsdon attests he was not involved in the incident on October 22, 2013. (ECF 10). After the incident, Logsdon and Officer Dilley witnessed Cooper write and sign "on his own free will a statement acknowledging he was sorry for what he had done." *Id.* ¶5. Logston further states that on December 3, 2013, he and Brinegar searched cell 4-A-11. The cell was chosen at random for search and housed Cooper and another inmate. No contraband was found, and no items were confiscated. Logston declares that at no time has he racially discriminated against, harassed, or stolen property from Cooper. *Id.* ¶6. Logsdon denies assaulting Cooper or witnessing other staff members assault him. *Id.*

### 4. Charles Barb, II

Officer Barb denies any involvement incident on October 22, 2013. (ECF 27-11). He declares that at no time has he racially discriminated against, harassed, or stolen property from Cooper. *Id.* ¶5. Barb denies assaulting Cooper or witnessing other staff members assault him. *Id.*

### 5. Brett Wilburn

Officer Wilburn denies any involvement incident on October 22, 2013. (ECF 27-12). He declares that at no time has he racially discriminated, harassed, or stolen property from Cooper. *Id.* ¶5. Wilburn denies ever assaulting Cooper or witnessing any other staff members assault him. *Id.*

### 6. David Hedrick

Officer Hedrick denies involvement incident on October 22, 2013. (ECF 27-13). Hedrick attests at no time did he deny Cooper a meal during the time he was on staff alert from October 22, 2013 to October 24, 2013. *Id.* ¶5. Hedrick states that at no time has he racially discriminated

against, harassed, or stolen property from Cooper. *Id.* ¶5. Hedrick denies assaulting Cooper or witnessing other staff members assault him. *Id.*

### 7.  Jeramiah Fontaine

Officer Fontaine denies involvement incident on October 22, 2013. (ECF 27-14). Fontaine attests at no time did he deny Cooper a meal during the time he was on staff alert from October 22, 2013 to October 24, 2013. *Id.* ¶5. He denies assaulting Cooper or witnessing other staff members assault him. *Id.* ¶6. He states that at no time has he racially discriminated against, harassed, or stolen property from Cooper. *Id.*

### 8.  Nicholas Hetz

Officer Hetz denies taking part in the search of Cooper's cell or confiscating any items from him on December 3, 2013. Hetz attests at no time has he racially discriminated against, harassed, or stolen property from Cooper. He denies assaulting Cooper or witnessing other staff members assault him. (ECF 27-17).

### 9.  Matthew Davis

Officer Davis denies involvement in the October 22, 2013 incident. He denies participating in the search of Cooper's cell on December 3, 2013, or confiscating any items from Cooper at that time. Davis attests that at no time has he racially discriminated against, harassed, or stolen property from Cooper, and denies assaulting or witnessing any other staff members assault him. (ECF 27-18).

### 10. Ronald Weber

Weber, a mental health professional counselor supervisor at WCI, attests that at no time has Cooper been denied mental health services at WCI. (ECF 27-20). Weber states he received correspondence from Cooper on October 29, 2014, which did not require a "face to face

14

interview." *Id.* ¶ 4; *see also* ECF 27-5, pp. 14-15. Weber indicates additional follow-up was not required and a copy of the correspondence was placed in the medical file. On November 20, 2013, Cooper made a verbal request to Nurse Wilt for mental health services. Cooper was seen during segregation review on December 13, 2013, by Mr. Hess, a psychologist. (ECF 27-20 ¶ 4; *see also* ECF 27-5, p. 17). On December 20, 2013, Weber met with Cooper to discuss his mental health concerns. (ECF 27-20 ¶ 4; *see also* ECF 27-5, pp. 18-20).

### D. Administrative Remedy Procedure

Cooper's Administrative Remedy Procedure ("ARP") request log shows that between October 25, 2012 and July 22, 2014, he filed a total of 49 ARPs at WCI. (ECF 27-21). On October 25, 2013, he filed ARP WCI #1659-13, alleging that he was assaulted on October 22, 2013. (ECF 27-22). On November 1, 2013, the ARP was dismissed for procedural reasons as final because the matter was referred to the IIU for an investigation. *Id.* [17]

Scott S. Oakley, Executive Director of the Inmate Grievance Office (IGO), states in his declaration that Cooper has filed has filed four grievances with the IGO since October, 22, 2013. (ECF 23). Two are relevant here.[18] IGO No. 20132213 was filed December 11, 2013, as an "appeal" from the disposition of ARP-WCI-1659-13, in which plaintiff complained that he was "battered and assaulted" by unknown WCI staff on October 22, 2013. *Id.* ¶3c. Oakley states the grievance was administratively dismissed on February 20, 2014, because Cooper's ARP complaint had already been administratively adjudicated in a disciplinary hearing conducted on

---

[17] The court is familiar with the Division of Correction's practice to decline an investigation for an ARP where one is already pending before the IIU. Notably, defendants do not seek dismissal of this action based on exhaustion grounds.

[18] The other IGO grievances concerned failure to protect from attack by other inmates and denial of a haircut. (ECF 27-21).

November 6, 2013, at the conclusion of which he was found guilty of a violation of inmate rule #101, assault on staff.

IGO No. 20132232 was filed December 16, 2013, as an appeal from a finding that plaintiff was guilty of violating inmate rule #101 (assault on staff) at the conclusion of a disciplinary hearing conducted on November 6, 2013. *Id.* ¶ 3d. On June 3, 2014, Administrative Law Judge (ALJ) Eileen C. Sweeney issued a final administrative decision in which she concluded that the grievance was without merit, and ordered that it be denied and dismissed. (ECF 24, 25).[19]

**DISCUSSION**

Cooper's claims of excessive force, unconstitutional conditions of confinement, retaliation, loss of property, inadequate medical and mental health treatment are considered separately.

**I.   Excessive Force**

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The use of force by a prison official violates an inmate's Eighth Amendment rights

---

[19] To the extent Cooper intends to raise a claim concerning the ARP process, an inmate has no constitutional right to the establishment of an administrative remedy or other grievance process or to participate in one voluntarily established by the state. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Insofar as Cooper may intend for his claims to be construed as allegations that defendants have violated their own policies, procedures, rules, and regulations, a mere violation of state law or regulation does not provide grounds for a due process violation. *Weller* 901 F.2d at 387.

when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'" *Wilkins*, 559 U.S. at 38 (citation omitted).

Eighth Amendment analysis focuses on whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. This court must consider multiple factors, such as the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U. S. at 321.

Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In a claim for excessive application of force, a claimant has the burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

Notably, "'not every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment. *Wilkins*, 559 U.S. at 37 (citation omitted). Conversely, the absence of "significant" injury is not dispositive of a claim of excessive force. *Id.* at 36-37. Moreover, if force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] had the good fortune to escape without serious injury." *Id.* at 37. Put another way, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment. *Id.* at 38-40. But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation. In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

Prison officials are charged with balancing competing governmental interests, such as the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 321. When force is needed to keep order, correctional officers may have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6. Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

"'It is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for

18

the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)).  However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment. *Williams*, 77 F.3d at 763.

There are three general categories in which courts have held that use of pepper spray or other chemical agents may constitute excessive force.  *See Wagner v. Warden*, 2015 WL 1276748, *34 (D. Md. March 19, 2015).  Eighth Amendment violations have found when an officer used far more than a reasonable quantity of a chemical agent.  *See, e.g., Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and another officer joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Second, violations have been found when a chemical agent was used without a prior verbal order, or after a prisoner had been subdued or had become compliant.  *See Tedder v. Johnson*, 527 F. App'x 269 (4th Cir. 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d. 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray without prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence inmate did not intentionally disobey officer and was sprayed without warning).

Courts have also held the Eighth Amendment can be violated when, after a prisoner is

pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention. *See, e.g., Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); *Norton v. City of Marietta*, 432 F.3d 1145, 1153-54 (10th Cir. 2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if "'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The United States Court of Appeals for the Fourth Circuit's decision in *Iko v. Shreve, supra*, 535 F.3d 225, involving use of pepper spray in extracting an inmate from his cell, encompasses discussion of all three categories. In *Iko*, the court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'" *Id.* at 239. Nevertheless, the court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," *id.* at 239-40; the inmate was "docile and passive throughout the cell extraction," *id.* at 239; the officer's "final burst of pepper spray was deployed after [the inmate] had lain down on the floor of his cell," *id.* at 240 (emphasis in original); and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never changed [the inmate's] clothing, never removed the

spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure." *Id.*

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D.W.Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown). Use of chemical agents is reasonable when a prisoner attempts to escape or evade an officer's control. *See Grayson v. Peed,* 195 F.3d 692, 696 (4th Cir. 1999). Use may be also reasonable when an officer is attempting to maintain order and discipline in the institution. *Santiago v. Walls*, 599 F.3d. 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson,* 315 F.3d. 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Cooper alleges that Officer Brinegar "hit, beat, kicked, and pepper sprayed him" in the lobby. (ECF 1, ¶1). Cooper states he was in handcuffs at the time. (ECF 6, ¶ 1. He alleges Brinegar ordered him to get off the ground and when he could not, Brinegar "snatched him up" and took him to the strip cage in the property room where Brinegar and Davis beat him and used pepper spray again. (ECF 1¶¶ 4-5).

Brinegar, however, denies conversing with Cooper before the escort, assaulting Cooper or witnessing any other staff person assault him. Lieutenant Gordon attests to observing Cooper struggling with Brinegar, attempting to kick Brinegar, and continuing to resist after Brinegar

21

took him to the floor. Gordon said four staff members, one of whom he identified as David Sipes, arrived to restrain Cooper. *Id.* at 24. Sipes, who witnessed part of the incident, corroborates that Cooper pulled away during the escort from an officer and continued to struggle after he was taken to the ground. Sipes attests that after pepper spray was administered, Cooper struggled and then gave up. Sipes said two officers were involved and they did not kick or punch Cooper, although Sipes was unable to identify the officers. Cooper's allegation that Officer Davis participated in the assault is controverted by the IIU investigator's findings that Davis was not on duty at the time of the incident. Similarly, Officer Barb, whom Cooper claims was involved in the assault, was not on duty at the time of the incident. In their affidavits, Officers Hedrick, Logsdon, and Wilburn deny Cooper's assertions they were involved in the incident. They each deny assaulting or witnessing other staff members assault Cooper. Officer Logsdon denies threatening Cooper to sign the letter of apology.

The record shows that during the escort to recreation, Cooper was observed pulling away from and kicking the escorting officer, Brinegar. Cooper continued to struggle once he was taken to the ground and pepper spray was administered. Brinegar told the IIU investigator that he issued several direct orders for Cooper to cease resisting. After Cooper failed to comply, he administered a short burst of pepper spray to his face. (ECF 27-4, p. 19).[20] Cooper complied shortly thereafter and was taken for medical evaluation. It is unclear how many officers responded to assist Brinegar, but of those named as defendants, all categorically deny assaulting Cooper. Several deny any involvement in the incident at all. In the case of Officers Davis and Barb, neither was on duty at the time of the incident.

In light of the declarations submitted by Brinegar, Sipes, and Gordon, the force applied was to restore discipline after Cooper resisted his escort, kicked the officer, and continued to

---

[20] Brinegar's account is corroborated in Officer Dilley's use of force report. *See supra* note 13.

resist after he was taken to the ground. After pepper spray was applied, Cooper was taken to the medical unit. Of further note, the medical records and photographs, while showing Cooper's eyes were clearly swollen, do not substantiate his claims of rib injury or head swelling. The photographs do not show he had a black or bruised eye. In sum, Cooper does not demonstrate that a genuine issue of material fact is presented and summary judgment will be entered as to his claim of use of excessive force.

## II.    **Conditions of Confinement**

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *see also Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) (observing the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely "restrictive or even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements-that the deprivation of [a] basic human need was objectively sufficiently serious, and that subjectively the officials acted with a sufficiently culpable state of mind. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.' *"Iko*, 535 F.3d at   238.   Only extreme deprivations can be characterized as punishment prohibited by the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8–9, (1992).   An

23

extreme deprivation is one "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

A conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

Cooper claims he was placed in a "strip cell" for three days afterward the incident without bedding, clothing, hygiene items, and medication. He also alleges he was denied food and medical care during the 8-4 shift on these days. Notably, he does not claim he suffered any injury as a result of these purported conditions. Cooper claims that B. Payton and S.A. Wilson told medical staff that his medication for high blood pressure, poor circulation, and a thyroid condition was "packed away" and unavailable to them. (ECF 1, p. 12). Cooper claims "on information and belief" his property and medications were never packed up or removed from his regular cell. *Id.* Cooper, however, provides no factual basis for this assertion. *Id.*

Cooper also claims defendants Connor,[21] "Hendricks," and Fontaine failed to provide him with meals. (ECF 1, ¶9). Hedrick and Fontaine, however, attest they did not deny meals to Cooper. (ECF 27-11, 27-12). Sergeant Payton attests that Cooper was given his allowable property and personnel hygiene products, including toilet paper, while on staff alert status. *Id.*

---

[21] Cooper did not name Conner as a defendant in this case.

Fontaine attests he did not deny Cooper a meal during the time he was on staff alert from October 22, 2013 to October 24, 2013. Further, Cooper's medical records show that he was seen by medical providers on October 23, 2014 and October 24, 2014, and did not report he was unable to take his medications. (ECF 27-5, pp. 2-5,7-8). Cooper's allegations, premised on his brief placement in the cell fail to identify any harm sustained and are insufficient to state an Eighth Amendment claim. Accordingly, summary judgment will be entered in favor of defendants as to these claims.[22]

### III. Medical and Mental Health Claims

In the context of denial of medical care, an Eighth Amendment violation arises when the actions of the defendants, or their failure to act, amounts to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). [23]

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because

---

[22] Cooper's claim that on December 2, 2013, Officer Brinegar turned off Cooper's shower after five minutes even though Cooper was entitled to a fifteen minute shower, fails to state a claim of constitutional moment. (ECF 6, ¶ 12).

[23] A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241, citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999).

prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir.1995), quoting *Farmer*, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429 U.S. at 105–06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48.

Cooper alleges when he was taken for medical evaluation after the incident, "correctional staff" permitted him to be treated for pepper spray exposure only, and not his physical injuries.[24] He claims unidentified correctional officers told Nurse Martin what they wanted him to write in his report about Cooper's visit to the medical unit. As defendants do not address this claim in their dispositive motion as supplemented and consolidated, summary judgment will be denied as

---

[24] *See also* JFM-14-629, ECF 1 ¶ 1, which was consolidated with the instant case.

to this claim subject to renewal by defendants with appropriate affidavits and verified exhibits within thirty days.

With the exception of Weber, none of the defendants is identified as a medical or mental health practitioner. As nonmedical correctional staff, they are entitled to rely on the medical judgment and expertise of prison medical and mental health providers concerning the course of treatment necessary for an inmate. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir.1990) (stating supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel). With the exception of Cooper's claim correctional staff would only permit treatment for his pepper spray exposure directly after the incident, Cooper's summary judgment will be entered in favor of defendants in regard to his claims of inadequate medical treatment.[25]

Further, Weber attests that attention was given to Cooper's request for mental health treatment to address his unspecified "psychological injuries." (ECF 1 ¶ 12). Specifically, Weber reviewed Cooper's mental health history, and determined a personal interview was not required. Weber and psychology associate Hess also met with Cooper on separate occasions. Weber attests that at no time has Cooper been denied mental health services at WCI. While Cooper may disagree with the type or nature of mental health evaluation he received, he does not specify the nature of his condition or a harm suffered. Cooper's claims at most exhibit disagreement with mental health staff over the course of his treatment. Accordingly, his claims of inadequate mental health treatment will be dismissed.

---

[25] Cooper's claims of inadequate medical treatment against medical providers are under review in Civil Action No. JFM-14-627.

## IV.   Retaliation

Cooper next claims that on December 3, 2013, defendants Hetz, M. Davis, Brinegar, and Logsdon conspired to search his cell and confiscated certain legal documents and personal items in retaliation for "reporting Brinegar and Logsdon to the IIU." (ECF 1¶ 11, 6 ¶ 12). In order to prevail on a retaliation claim, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *Compare Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Maryland, Inc. v. Wicomico County*, Md., 999 F.2d 780, 785 (4th Cir. 1993), "In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) quoting *Adams v. Rice*, 40

F.3d 72,74 (4th Cir. 1994).  A plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To make  a prima facie case of retaliation, a plaintiff has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  In the prison context, a plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 & n. 4 (9th Cir. 1985).   Preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id.* at 532.  After a plaintiff  makes a prima facie showing, the burden shifts to defendants to demonstrate that they would have reached the same decision even in the absence of a plaintiff's constitutionally protected conduct. *Mt. Healthy*, 429 U.S. at 287.

In their declarations, Hetz  and Davis deny taking part in the search of Cooper's cell or confiscating any items on December 3, 2013.  Officers Brinegar and Logsdon attest Cooper's cell was chosen at random for a cell search and no contraband was found or confiscated.  Cooper does not dispute that removal of contraband is a legitimate institutional goal necessary to maintain institutional safety and discipline.

The court finds no material disputed fact on which Cooper could persuade a reasonable factfinder to hold the defendants liable on this retaliation claim. Even assuming without finding that the officers discard some documents during the shakedown because of the IIU investigation, Cooper fails to allege facts indicating any specific, adverse effect this conduct had on his litigation efforts. For the same reason, Cooper would be unable to  prevail on a separate claim

that the alleged confiscation of legal documents and materials violated his right to access the courts. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996) (holding that inmate states no actionable access claim absent a specific showing that a challenged action caused harm to his litigation efforts).

To the extent Cooper claims loss of personal property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533, (1984) (unauthorized intentional deprivation of property by prison guard did not constitute violation of due process clause as meaningful post-deprivation remedies were available under state law); *Parratt v. Taylor*, 451 U.S. 527, 542–44 (1981) (negligent deprivation of inmate's property does not violate the due process clause, so long as meaningful post-deprivation remedies are available), overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327 (1986). Cooper must pursue his loss of property claims under Maryland's Tort Claims Act and through the Inmate Grievance Office. The right to seek damages and injunctive relief through Maryland's courts and administrative agencies constitutes an adequate post-deprivation remedy. *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D.Md. 1982).[26]

## V.   Verbal Taunts

Lastly, Cooper allegations that Brinegar has threatened him, called him a "niggar," and blew him a kiss (ECF 27-6, ¶ 5, 14, 16, are insufficient to state a constitutional claim. To be sure, such actions if true are vile and unprofessional. However, use of threats and racial slurs by corrections officers without more does not state a federal claim. *Collins v. Cundy*, 603 F.2d 825, 82 (10th Cir. 1979). "[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Mere verbal abuse and taunting inmates by guards,

---

[26] Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given Juncker's reliance on Parratt in dismissing plaintiff's due process claim.

including aggravating language, does not state a constitutional claim. *See McBride v. Deer,* 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) (stating "acts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment"). Verbal harassment and aggravating language, without more, do not amount to a constitutional violation. *See Blades v. Schuetzle,* 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); *McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir. 1983); *Cole v. Cole,* 633 F.2d 1083, 1091 (4th Cir. 1980); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir. 1973). Notably, Cooper does not allege that he actually suffered any physical harm as a consequence of Brinegar's purported actions and comments. Such conclusory and unsubstantiated assertions of harassment do not support a cognizable cause of action under § 1983.

## CONCLUSION

For reasons set forth herein, defendants' motion for summary judgment will be denied in part and granted in part. Summary judgment shall be denied subject to renewal within twenty-eight days with verified exhibits and affidavits as to the claim that correctional personnel would not permit Nurse Martin to address Cooper's physical injuries when he was taken to the medical unit after the use of force incident on October 22, 2013. Summary judgment will be granted in favor of defendants as to all other claims. A separate order follows.

_____
Date

_____
J. Frederick Motz
United States District Judge

31